## No. 9364.

### J. M. SEIXAS, SYNDIC, ETC. VS. MRS. R. BRUGIER.

Where an agent, entrusted with bonds belonging to his principal, used them without the owner's authority and substituted in their place other securities, and the owner, when hearing of the transaction, ratified it, *held* that the syndic of the agent who had become insolvent could not complain of the transaction or recover the substituted securities.

A fair exchange of values may be made at any time without breach of any prohibition of the insolvent laws.

The ratification, though made after failure and within three months preceding the surrender, retroacted in its effect so as to make the transaction valid *ab initio*; and, inasmuch as the exchange would have been lawful if it had been made at the date of the ratification, no rights of creditors had intervened authorizing them to object to its retroactive effect.

Even independent of the effect of ratification, the rights of the holder to retain the substituted securities, would be maintained under the doctrine that when the agent, holding for safe keeping the property of his principal, converts it into different property by exchange or otherwise, the latter, remaining capable of identification, will be subject to the rights of the original owner.

APPEAL from the Civil District Court for the Parish of Orleans. *Righter, J.*

*Bayne & Denègre* for Plaintiff and Appellee.

*Alfred Grima* for Defendant and Appellant:

1. Antoine and Emile L. Carrière, having under their administration as agents of the defendant, Mrs. Brugier, various bonds belonging to her, used the same in the interest of the firm of A. Carrière & Sons, composed of themselves and another partner, and substituted therefor values represented by several notes which are in the possession of Mrs. Brugier, and inferior in value to her said bonds. The firm of A. Carrière & Sons, having made a cession of their property to their creditors subsequently to the said transactions, their syndic now sues Mrs. Brugier for the return of the said notes to the said insolvents' estate, as having been transferred by fraudulent preference to her.

This is neither a case of pledge nor of preference of any kind, or of borrowing. It was a conversion to their use by agents, of property of their principal, without the latter's authority, and their substituting property as the investment of the property converted; the substituted notes are accepted by the principal, and their transfer to her was neither fraudulent nor injurious to the rights of the creditors of A. Carrière & Sons. 96 U. S. 337, Cook vs. Tullis.

2. A. Carrière & Sons enjoyed the highest credit and standing until the very day of their suspension, 10th June, 1884, up to which date neither Mrs. Brugier nor any one knew, suspected or had any reason of suspecting their insolvency; and no transaction made in good faith with them could be attacked on the pretence of a state of insolvency existing at the time when it could not be even surmised. The naked fact of the insolvency of a debtor at the time of entering into a contract with a third party, is not a cause for its revocation; knowledge of the said insolvency at the time must be brought home to the party contracting with the insolvent. R. C. C., 1984; 4 Rob. 408 and 438; 24 Ann. 158; 34 Ann. 883; 125 Mass. 249; 74 Ill. 242; 97 U. S. 80.

3. "In order to constitute a fraud, two conditions are legally necessary: there must be the intention of defrauding, *consilium fraudis*, and the event or the effective and actual

loss sustained by the creditors, *eventus damni*; if one of these requisites does not exist, there is no fraud." 18 La. 388, Montilly vs. His Creditors; Rev. C. C. 1970, 1978, 1981, 1984, 1986; also 2 Rob. 92; 16 Ann. 402; 21 Ann. 668; 31 Ann 197; 35 Ann. 385; 2 Demolombe (Contrats) §§ 175, 176, 185, 190, 193, 196, 203, 225; 4 Marcadé, p. 402; 16 Laurent, §§ 434, 435, 440 to 444, 446 to 449; 4 Bedarido (Fraude), p. 34, § 1432.

4.  To constitute legal fraud in case of a preference given by an insolvent to one creditor over another, so as to effect the preferred creditor, it must appear that the creditor, as well as the debtor, was not in good faith, that he knew of the insolvency of the debtor, and contemplated the securing to himself of an advantage over the other creditors. 3 Ann. 248, Gillespie vs. Cammack. 16 La. 370; 31 Ann 196; 61 New York, 626; 37 Illinois, 342; 63 Id. 486.

.5.  If a contract be onerous, and made in fraud on the part of the debtor, but in good faith on the part of the person with whom he contracted, it cannot be annulled by creditors, unless the value of the property transferred exceed by one-fifth the consideration given for it; and if in such case the contract should be annulled, the consideration given must be returned with interest. Rev. C. C., 1981; 2 Demolombe (Contrats), p. 193, § 196; 4 Marcadé (Art. 1167), p. 405, Sect. IV., parag. 499; 16 Laurent, page 509, § 443.

·6.  An exchange of valid securities, even when the creditor and debtor knew of the latter's insolvency, cannot be impeached by the other creditors as a fraudulent preference, no injury being thereby caused to them. 91 U. S. Rep. 114, Sawyer vs. Turpin; 18 Wall 332, Cook vs. Tullis.

7.  The using of the defendant's bonds was made subject to a *sine qua non* condition and obligation, contracted as far back as January, 1884, that securities of like value were to be simultaneously substituted therefor. Even had the transfer attached been made, as contended by plaintiff, within *three* months preceding the failure, and *cesio bonorum* of A, Carrière & Sons, it should be tested *by the date of the agreement.* Equity considers as done that which ought to have been done, and that which was promised to be done. Wherefore the said transfer cannot be viewed as a preference given within three months, as aforestated. Rev Stat. La. 1808; 2 New Series, 588 Wyer's Syndic vs. Sweet and al. 17 Fed. Rep., 705; 1 Story's Eq. Jur., 60; 2 Ib. 1212 and 1213.

·8.  A. Carrière & Sons could not have set up the want of timely compliance with their agreement to substitute value in place of the bonds taken; their syndic cannot plead the same against the defendant, who acted in good faith and gave just consideration for the notes held by her. 95 U. S. Rep., 766, Yeatman vs. Savings Institution; 2 Story's Circ. Rep., Mitchell vs. Winslows; 18 Wall. 332, Cook vs. Tullis.

*Thos. J. Semmes* on the same side.

The opinion of the Court was delivered by

FENNER, J.  A. Carrière & Sons was a commercial firm of this city, engaged in the banking and commission business, and composed of Antoine Carrière, Emile Carrière and Chas. J. Carrière.

This firm failed in June, 1884, and on the 18th of July, 1884, took the benefit of the insolvent laws of this State and made a cession of its property to its creditors; and the plaintiff in this suit is duly appointed and qualified syndic.

Antoine Carrière and Emile Carrière jointly and severally were the agents, general and special, of Mrs. Romain Brugier, the defendant herein, under power of attorney, exceedingly broad in its terms, grant-

ing to "them and to each of them separately," "full power and authority, in her name and behalf, to conduct, manage, transact and administer all and singular her affairs, business, properties and concerns in this city and State, of whatsoever nature or kind, without exception or reservation whatsoever." The mandate proceeded to confer upon the agents a multitude of special powers, embracing those to collect all dues; to deposit and check out her funds; to sell all shares of stock in corporations; to vote in all meetings of stock-holders; to lease property, collect rents and contract for repairs; to represent her in judicial proceedings; to transact and compromise, etc.

Amongst other special powers was that "to purchase real estate, mortgage notes, or any other securities or property, as the said constituents or either of them may think proper, for such price and on such terms and conditions as they shall think fit."

No express power was granted, however, to sell, exchange or pledge such securities when bought.

The affairs of Mrs. Brugier were important; the powers conferred were extensive; and in their execution, the agents seem to have been left entirely uncontrolled by any interference or supervision of Mrs. Brugier, who, from first to last, seems to have reposed unlimited confidence in her agents, and to have considered them as solvent as the Bank of England.

In fact, however, the firm of Carrière & Sons was seriously embarrassed, though their credit retained the highest character in commercial circles down to the very day of the failure.

Besides being a creditor for a very large amount, Mrs. Brugier had in the hands of her agents valuable securities, including $17,000 in city certificate bonds, $14,500 in levee steam cotton-press bonds, and $2000 in water-works bonds.

These securities seem ordinarily to have been kept by her agents in a bank-box bearing her name, of which they had the key and full control.

In January, 1884, the firm of Carrière & Sons having urgent need of banking accommodations, which, in the then stringent monetary conditions, were more easily obtainable upon securities like those of Mrs. Brugier than upon the ordinary bills receivable in the firm's portfolio, a conference was held between the two agents, Antoine and Emile Carrière, at which it was determined that they would withdraw Mrs. Brugier's securities and use them for the purposes of the firm, replacing them, however, at the same time by bills receivable of equivalent value belonging to the firm.

Accordingly, her securities, all negotiable and running to maturity, were withdrawn and pledged to about their value; while, at or near the same time, bills receivable of equivalent value were set aside to Mrs. Brugier. The latter were not placed in Mrs. Brugier's bank-box, but they were placed in an envelope, not bearing her name, but superscribed: "Pour remplacer: $17,000 City Certificate bonds; $14,500 Levee Steam Cotton Press bonds; $2,000 Water-works bonds."

This envelope was not placed in the port-folio of the firm, but was kept in the private port-folio of Emile Carrière.

This first exchange of securities was followed by others. When the bills receivable in the envelope would mature or other occasion for their use by the firm would arise, Emile Carrière would withdraw and use them for the firm, replacing them, however, by others of equal value.

No entry of these transactions was made upon the books until May 12, 1884, when, having made a fruitless effort to resume possession of the misappropriated bonds, the following entries were made upon the cash-book of the firm: On the debit side: "Billets à recevoir passés à Mme. Vve. R. Brugier," describing them; on the credit side, the bonds described, "Achetés de Mme. Brugier." On the same day, the envelope containing the bills referred to was placed in Mrs. Brugier's bank-box, where they remained untouched until the 10th day of June, when, for the first time, she was informed of what had been done, and the bank-box with the substituted securities were delivered to and accepted by her in lieu of her alienated bonds.

These are the substantial facts as developed by the testimony of Emile Carrière, supported by the production of the endorsed envelope, the entry on the books of May 12, and the testimony of Mrs. Brugier as to the delivery to her.

His testimony, owing to the death of Antoine Carriere, is the sole evdence touching the facts prior to May 12. Though assailed in argument as improbable and untrustworthy, the improbability is not apparent and its trustworthiness is not impeached by any evidence, direct or circumstantial. We must act upon it, or upon no evidence. Mrs. Brugier is defendant in this suit and possesses these securities as owner. We cannot be expected to divest her title and possession, unless they are conclusively overthrown by her adversary, who carries e burden of proof.

The present action is brought by the syndic against Mrs. Brugier to annul and avoid the transfer and to recover the securities or their

value. The basis of the action is found in the allegations that the transfer was made on May 12, 1884, within three months next preceding the failure, in order to give an unjust preference to Mrs. Brugier as a creditor and without any consideration delivered by her at the time— all claimed to be void under Section 1808 of the Revised Statutes.

The theory of the plaintiff is to isolate the conversion of ·Mrs. Brugier's bonds from the concurrent replacement of them by other securities; to treat said conversion as merely making Mrs. Brugier a creditor for their value; ·and to have the transaction of May 12, 1884, considered as a. prohibited transfer made, *in tiempo inhabil,* without present consideration, to a mere creditor for the purpose of giving ·an unjust preference.

We cannot accept this theory.

Its effect would be to suppress essential parts of an unique transaction and to extend the wrong done to Mrs. Brugier beyond the limitations imposed on it by the wrong-doers themselves. Fortunately for her, her agents did not commit the flagrant crime of embezzling and making way with her bonds without consideration. Their offense consisted in exchanging her bonds for other securities belonging to their firm. She might unquestionably have authorized her agents to make such an exchange even with their own firm, and, done under such authority, its validity would have been unquestionable. Executed without authority, the exchange was not binding on her. When informed of it, she might have repudiated it, and might have held her agents bound as debtors for the value of her converted bonds. But she possessed the undoubted right of ratifying the exchange and of thus imparting to it retroactive validity *ab initio,* unless prior to the the ratification, rights of third persons had intervened, which the ratification could not be permitted to defeat.

It is claimed that the ratification having taken place only after the failure and within three months preceding insolvency, the rights of the creditors of Carriére & Sons under our insolvent laws had intervened and operated as a bar to the ratification.

This claim may be disposed of in the language of the Supreme Court of the United States in a case strikingly similar, arising under the bankrupt law. There an agent entrusted with the custody of bonds belonging to his principal, had, without authority, substituted for them bills receivable belonging to himself, and had used the bonds. Subsequently, he made a new substitution of a note and mortgage for the bills originally substituted. After his failure, and within less than

a month of his bankruptcy, he informed the principal of his dealings, and delivered to him the note and mortgage, which the latter accepted. The assignee in bankruptcy brought against the principal an action precisely similar to this.

It is rare to find two cases running so exactly "on all fours."

In discussing the effect of the ratification the court said: "The question in this case is, whether any rights of third parties did thus intervene between the substitution made by Homans and ratification by Tullis, which defeated the retroactive efficacy of the ratification. And the test is, could the parties have made the transaction at the time of the ratification, without contravening the provisions of the Bankrupt Act?" The court held they could; that the dealing was an exchange of securities and not a transaction with a creditor, and, therefore, not subject to the prohibition against unjust preferences in favor of a creditor; that it was a fair exchange of values which could be made at any time prior to actual surrender in bankruptcy; that, if it had been made at the date of the ratification, it would have been obnoxious to no complaint; and, therefore, there was no obstacle to the retroactive effect of the ratification. The court concluded on this point by saying: "the position of counsel that the ratification, if sustained, only extended to the conversion of the bonds, and that all else consisted of dealings by Homans with his own property," (precisely the contention here) "is not tenable. The answer to it is that the ratification was of the whole transaction taken together; that of the appropriation of the bonds upon substituting an equivalent in value for them, not of a part without the rest, not of the appropriation without the substitution."

But, independently of the question of ratification, the court held the transfer unassailable under the well-settled principle "that where property held upon any trust to keep, or use, or invest in a particular way, is misapplied by the trustee and converted into different property or is sold and the proceeds are thus invested, the property may be followed wherever it can be traced through its transformations, and will be subject, when found in its new form, to the rights of the original owner or *cestui que trust.*" And it held that the conversion of the bonds was a conversion of them into the substituted securities which took their place and were subject to the claim of the original owner. Cook vs. Tullis, 18 Wall. 332.

The law is said to be a "science of distinctions;" and it is the highest test of judicial acumen in the application of authorities to observe and enforce such distinctions.

We have exercised our whole powers of discrimination without being able to discover any substantial distinction between the case in hand and that of Cook vs. Tullis.

On the other hand, the case of Casey vs. Cavaroc, 6 Otto, 467, relied on by plaintiff's counsel, is obviously distinguishable. That was a case where the claimant of the securities was a simple creditor, as to whom the court said, "it must not be overlooked that the credit Mobilier has no other claim to the securities in question but that of pledge. A pledge and possession which is its essential ingredient, must be made out, or their privilege fails. * * Without the privilege or right of preference, the credit Mobilier has no claim to hold the securities in question as against the other creditors." Holding that the pledge was invalid for want of the requisite transfer of possession, the court maintained the demand of the receiver.

Far from overruling the case of Cook vs. Tullis, the court referred to it with others, but said, "these were all cases in which the creditor claiming adversely to the assignee, had a clear legal or equitable title to the property claimed. None of them stood, as the present case does, upon the claim of a privilege expressly denied by law."

So, in the instant case, Mrs. Brugier sets up no right as pledgee or as creditor, but solely as owner.

There was never any claim or pretense of a pledge. The transaction was, in shape and in fact, an exchange of securities; one which, if the agent had been authorized, would have operated an instant transfer of title; which, done without such authorization, was subject to the principal's option of ratification; one which she did ratify; which would have been valid, if made at the date of ratification, and which, therefore, by the retroactive effect of the ratification, acquired validity *ab initio*, and must now be maintained.

We have not found it necessary to advert to the successive substitutions of new securities. The same feature was presented in Cook vs. Tullis. Evidently each stood upon the same basis with the original substitution and is governed by the same considerations. Nor is the case affected by the fact that some of them were made within the three months preceding the failure. Such exchanges, as we have seen, being of fair equivalents, fell within no prohibition of the insolvent laws. And it is admitted that the securities received by Mrs. Brugier were of less value than her bonds.

Such is the clear solution of the questions of law arising on the facts as evolved from the testimony of Emile Carrière. But, suppose we were to eliminate all the facts prior to the transaction of May 12, 1884,

when, though disguised in the form a double sale, a real exchange was undoubtedly effected. At that date, Mrs. Brugier's bonds stood pledged by her agents for their own debt without her authority.

That pledge, though subjecting them to the privilege of the pledgees, did not divest her *ownership* of the bonds. They were still *her* bonds. On that day, her agents made the final exchange of her bonds for the securities subsequently delivered to her. What prevented such an exchange? It was a fair exchange of values. If she had been a party to the transaction, would it not have been valid? Would the fact that her agents had unlawfully pledged her bonds for their own debt, have operated as an obstacle to such exchange? Would it not have been their right and duty to liberate her bonds, by paying the debt for which they were pledged, or, if the pledgees would consent, by substituting in their place securities belonging to themselves? Or, might they not have sold the securities and recovered her bonds by paying the pledged debt with the proceeds.

The answers to these questions seem sufficiently simple. And, if Mrs. Brugier chose to accept the securities directly in exchange for her bonds, we see nothing in the insolvent or any other law to prevent it. Her subsequent ratification, as we have seen, imparted to the transaction the same validity as if she had been originally a party to it, and we see no ground on which her title can be successfully impeached.

The unlawful pledging of her bonds did not change her position from that of owner to mere creditor. The relation of debtor and creditor would not have arisen until the agent had made default in the return of her property on demand. In this case it never arose, because, on demand, she was notified of and ratified the exchange which had been made, and accepted the substituted securities. Under no view can the transaction be treated as a dealing with a creditor or giving an unjust preference as such.

It is, therefore, ordered, adjudged and decreed, that the judgment appealed from be annulled, avoided and reversed; and it is now decreed that there be judgment for defendant, rejecting plaintiff's demand at his cost in both courts.

Rehearing refused.

BERMUDEZ, C. J. and POCHÉ, J. dissent.

### DISSENTING OPINION.

BERMUDEZ, C. J.   I think the evidence shows that an unjust preference was given to the defendant within the three months preceding

the failure, and that the transaction should be declared to be a nullity, it being nothing but a *dation en paiement* by the insolvents to the defendant, to extinguish their indebtedness to her, arising from their diversion of her securities and their liability for their value. The transaction is not shown to have taken place simultaneously, as is claimed by the defendant. From the evidence, I think the insolvents first appropriated to themselves, without any understanding or agreement, the securities of the defendant and long after strove to replace them by other securities of their own.

The possession of these securities by the defendant might have militated strongly in her favor, had she not herself brought forward evidence which, however weak in itself, has nevertheless proved destructive of any presumption of *rightful* ownership in her.

The object of the law, as found in the R. S., is double: *first*, to deprive the insolvent of the benefit of the insolvent laws, and second, to annul all acts of the debtor done within the three months preceding his insolvency, in consequence of which, a creditor for an antecedent debt is placed in a better condition, injurious to the other creditors, to which, otherwise, he would not be entitled. The fact of the gratuitous and injurious bettering of his condition to the detriment of other creditors is what the law frowns upon and proposes to undo.

In such cases the intention of the parties is immaterial. It is indifferent whether they or either proposed or designed to do a fraudulent act. The fraud need not be *actual*. It is sufficient if it be *constructive*, that is, if it exist in contemplation of law.

The ruling invoked in 18 Wall 337 was not made in a parallel case. The facts there were not what they are here, and the bankrupt law considered is not analogous to the provision herein invoked by plaintiff on behalf of the creditors of the insolvents.

It is difficult, not to say impossible, to discern what difference exists in principle between this case and that of Black vs. Richardson, recently decided, in which this Court distinctly held that the clear object of the law in such instances is to secure a perfect equality among the creditors of an insolvent whose property is the common pledge of all his creditors.

I think the judgment appealed from should be affirmed.

POCHÉ, J. I cannot concur in the conclusions reached by the majority of the Court in this case.

The suit brought by the syndic is not the revocatory action for the purpose of cancelling an undue preference, as contended for by defend-

ant's counsel. It is simply the action provided for by Section 1808 of the Revised Statutes of 1870.

The elements of proof necessary to plaintiff's recovery are therefore, that Mrs. Brugier was a creditor of the firm of A. Carrière & Sons, and that they transferred to her the securities in suit, for the purpose of securing her in preference over their other creditors within three months next preceding their failure.

If it can be proved that the relations between Mrs. Brugier and the insolvent firm, resulting from their use of her bonds, were those of creditor and debtor, the second point of inquiry is stripped of all the difficulty, because the transfer as shown by the books of the firm was made on the 12th of May, 1884, and the firm's insolvency was announced to the world on the 10th of June following.

The theory that the transaction by which the Carrières took possession of Mrs. Brugier's bonds and pledged them to secure loans of money in January, 1884, was an exchange, is not supported by the preponderance of the evidence in the record.

It is true that, in his testimony in this case, E. L. Carrière, who was the real head and manager of the firm, states that such was the nature of the transaction; and that on the day that he appropriated her bonds, he set apart for her in an envelope an equivalent amount of securities. But his statements are not borne out by undisputed facts evolved out of his own conduct, subsequent to the pretended exchange, and they are flatly contradicted by some of his own statements. He admits that whenever any of the paper which, under his theory had become the property of Mrs. Brugier by exchange, reached maturity, it was taken out of the envelope, collected, and that the proceeds were placed to the credit of the firm, and not to that of Mrs. Brugier, who was avowedly kept in perfect ignorance of all these manipulations by her agents.

A safer mode of testing the conduct of E. L. Carrière, and of ascertaining the true intent and meaning of the transactions which he conducted under his double-headed capacity of principal in the firm of A. Carrière & Sons and of agent of Mrs. Brugier, is to be found in the examination of his acts and words previous to the failure, than by considering his testimony in this case.

In the first place the absence of an entry in the books touching the alleged exchange of securities amounting to so large a sum, the absence of any entry to show the source of collections realized from notes which were ostensibly her property, is more eloquent than words to describe the real nature of the transaction.

But the meaning of that silence is more than illustrated by Mr. Carrière himself by the answer which he gave on cross-examination to inquiries by counsel as to the reasons for making the entry of the pretended exchange on the 12th of May, 1884, and not before.

He answered thus:

"Because my father told me on that day that he wanted the thing to be settled. We were always expecting to get back those bonds, but Mr. Hardie told me he did not want to exchange the bonds. We waited to the expiration of the maturity of the loans. My father said, 'Enter a sufficient amount of notes to Mrs. Brugier's credit in place of those bonds.'"

If the exchange had been consummated in January, why should the father insist in May following that the thing should be settled; and if Mrs. Brugier was not a creditor, why give an order to enter notes sufficient in amount to her *credit* on account of those bonds?

But the words spoken out of court by E. L. Carrière are yet more significant, and shed greater light on the whole subject.

In a conversation with M. C. Randall, the expert appointed by the court to examine the books of the defunct partnership, he became very confiding and thoroughly communicative on the subject, and he spoke as follows: "He made those entries for the purpose of doing what he considered an honorable act; that if he had not done it he would have thrown himself in the Mississippi river; that he had used the property of Mrs. Brugier which had been placed in his hands as a trust and as a matter of honor he had made this entry." And further:

"And he gave her those notes for the purpose of settling for those bonds. He stated that he owed her a great deal more. But this was a trust fund, and he had done this as a gentleman in order to secure her."

And thus from the lips of the prime mover in the *res gestæ* flow the very words which afford an absolute solution of the problem.

He had used the property of Mrs. Brugier, and he transferred the notes to her in order to secure her. Does this language sound like an exchange made simultaneously with appropriation of her bonds?

The true version of the case, which is actually demonstrated by the record, is that the Carrières, being in a great stress for money, simply used the property of their principal in order to raise the funds necessary to bridge over some alarming difficulty, so as to obtain a short breathing spell. They had no definite or settled programme for a future settlement with Mrs. Brugier. It was the struggle of a "drowning horse catching at a straw."

They knew that their concern was rotten to the core. The appearance of the firm's standing to the outer world had to be kept up. Some eyes blinded with confidence in the house's inexhaustible resources, were about to be opened, and they had to be closed. Like consumptive patients, they hoped against hope, and continued their battle against civil death. But time was about to tell the story in May, and the day of settlement with Mrs. Brugier in the near future loomed up to their vision like an ugly phantom. And then, and then only, losing all hope of ever regaining possession of her bonds, they perfected their "*honorable*" settlements with her.

They were her debtors; they secured her within the prohibited time; the law says that the deed is null, but the majority of the Court thinks otherwise as to the effect of the evidence.

I therefore respectfully dissent; and I think that the judgment of the district court should be affirmed.